**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

MICHAEL ALLEN ISRAELSON,

                                    Plaintiff,

        vs.

ANDREW SAUL,[1]
Commissioner of Social Security,

                                    Defendant.

Case No. 1:17-cv-00011-SLG

**DECISION AND ORDER**

On or about March 20, 2014, Michael Allen Israelson filed an application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2]

alleging disability beginning December 5, 2012.[3]  Mr. Israelson has exhausted his

administrative remedies and representing himself, filed a Complaint seeking relief from

this Court.[4]

Construed liberally, Mr. Israelson's opening brief asks the Court to reverse and

remand the agency decision.[5]  The Commissioner filed an Answer and a brief in

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  See also section 205(g) of the Social Security Act, 42 U.S.C. 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The Court uses the term "disability benefits" to describe Disability Insurance Benefits.

[3] Administrative Record ("A.R.") 101, 245.  The ALJ decision cites January 31, 2014 as the application date.  A.R. 101.  The SSA Notice of Disapproved Claims of August 19, 2014 denied DIB and SSI claims for Mr. Israelson, but there is no application for SSI benefits in the Court's record, nor does the ALJ refer to an SSI claim in her May 10, 2016 decision.  A.R. 101, 171.

[4] Docket 1 (Israelson's Compl.).

[5] Docket 20 (Israelson's Br.).

opposition to Mr. Israelson's opening brief.[6]  Mr. Israelson did not file a reply brief.  Oral

argument was not requested and was not necessary to the Court's decision.  This Court

has jurisdiction to hear an appeal from a final decision of the Commissioner of Social

Security.[7]  For the reasons set forth below, Mr. Israelson's request for relief will be granted.

## I.     STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned

unless it is either not supported by substantial evidence or is based upon legal error.[8]

"Substantial evidence" has been defined by the United States Supreme Court as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."[9]  Such evidence must be "more than a mere scintilla," but may be "less than

a preponderance."[10]  In reviewing the agency's determination, the Court considers the

evidence in its entirety, weighing both the evidence that supports and that which detracts

from the administrative law judge ("ALJ")'s conclusion.[11]  If the evidence is susceptible to

more than one rational interpretation, the ALJ's conclusion must be upheld.[12]  A reviewing

---

[6] Docket 16 (Answer); Docket 23 (Defendant's Br.).

[7] 42 U.S.C. § 405(g).

[8] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[9] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[10] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[11] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[12] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920,

court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which she did not rely."[13] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[14]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[15]  In particular, the Ninth Circuit has held that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[16]

## II.    DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[17]  In addition, SSI may be available to individuals who are age 65 or older, blind,

---

921 (9th Cir. 1971)).

[13] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[14] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[15] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[16] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

[17] 42 U.S.C. § 423(a).

or disabled, but who do not have insured status under the Act.[18]  Disability is defined in

the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[19]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[20]

The Commissioner has established a five-step process for determining disability

within the meaning of the Act.[21]  A claimant bears the burden of proof at steps one through

four in order to make a prima facie showing of disability.[22]  If a claimant establishes a

---

[18] 42 U.S.C. § 1381a.

[19] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[20] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[21] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[22] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

prima facie case, the burden of proof then shifts to the agency at step five.[23]   The

Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational

expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404,

subpt. P, app. 2."[24]   The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**   Determine whether the claimant is involved in "substantial gainful activity."

*The ALJ concluded that Mr. Israelson had not engaged in substantial gainful activity since*

*December 5, 2012, the alleged onset date.*[25]

**Step 2.**   Determine whether the claimant has a medically severe impairment or

combination of impairments.   A severe impairment significantly limits a claimant's physical

or mental ability to do basic work activities and does not consider age, education, or work

experience.   The severe impairment or combination of impairments must satisfy the

twelve-month duration requirement.   *The ALJ determined that Mr. Israelson had the*

*following severe impairments:  degenerative disk and facet disease of the lumbar spine*

*and tendinosis of the right shoulder.   The ALJ found that Mr. Israelson's adjustment*

*disorder, reading disorder, and disorder of written expression were non-severe.   ALJ*

*LaCara determined that Mr. Israelson's depression and anxiety were not medically*

*determinable impairments because "the medical evidence of record does not include a*

*diagnosis of either condition by an acceptable medical source."*[26]

---

[23] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[24] *Tackett*, 180 F.3d at 1101.

[25] A.R. 103.

[26] A.R. 103–04.

**Step 3.**  Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1 that are so severe as to preclude substantial gainful activity.  If the impairment(s) is/are the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.  *The ALJ determined that Mr. Israelson did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[27]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[28] *The ALJ concluded that Mr. Israelson had the RFC to perform light work except he was limited to standing and walking for four hours in an eight-hour workday and sitting for up to six hours in an eight-hour workday with normal breaks, with a sit/stand option to allow Mr. Israelson to alternate between sitting and standing positions at every hour for about five minutes at a time without leaving the work station; frequently operating foot controls bilaterally; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; frequently balancing with an assistive device; occasionally stooping, kneeling,*

---

[27] A.R. 105.

[28] 20 C.F.R. § 404.1520(a)(4).

*crouching, and crawling; occasionally reaching overhead with no work past shoulder level*

*on the right side; frequently reaching with the right upper extremity in all other directions;*

*avoiding moderate exposure to extreme cold, excessive vibration, and hazardous*

*machinery; and avoiding all exposure to unprotected heights.*[29]

**Step 4.** Determine whether the claimant is capable of performing past relevant

work. At this point, the analysis considers whether past relevant work requires the

performance of work-related activities that are precluded by the claimant's RFC. If the

claimant can still do his past relevant work, the claimant is deemed not to be disabled.

Otherwise, the evaluation process moves to the fifth and final step. *The ALJ found that*

*Mr. Israelson was unable to perform any past relevant work.*[30]

**Step 5.** Determine whether the claimant is able to perform other work in the

national economy in view of his age, education, and work experience, and in light of the

RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled. *The*

*ALJ determined that considering Mr. Israelson's age, education, work experience, and*

*residual functional capacity, there were jobs that existed in significant numbers in the*

*national economy that Mr. Israelson could perform, such as bench assembler and basket*

*filler.*[31]

---

[29] A.R. 106.

[30] A.R. 113.

[31] A.R. 114.

The ALJ concluded that Mr. Israelson was not disabled at any time from December 5, 2012 through May 10, 2016, the date of the decision.[32]

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Mr. Israelson was born in 1969; he is 50 years old.[33] He reported working as a truck driver from approximately April 2007 to December 2012. In the past, Mr. Israelson reported working as a commercial fisherman from approximately 1999 to September 2006 and as a warehouse worker. He reported having a valid commercial driving license at the time of the February 2016 hearing.[34]

On August 19, 2014, the Social Security Administration ("SSA") determined that Mr. Israelson was not disabled under the applicable rules.[35] On September 11, 2014, Mr. Israelson timely requested a hearing before an ALJ.[36] On February 8, 2016, Mr. Israelson appeared and testified with a representative at a hearing held before ALJ Cecilia LaCara.[37] On May 10, 2016, the ALJ issued an unfavorable ruling from December 5, 2012 through the date of her decision.[38] On August 2, 2017, the Appeals Council denied

---

[32] A.R. 114–15.

[33] A.R. 245.

[34] A.R. 113, 134, 150–53, 268.

[35] A.R. 160, 171.

[36] A.R. 178.

[37] A.R. 132–54.

[38] A.R. 101–15.

Mr. Israelson's request for review.[39]   Mr. Israelson timely appealed to this Court on September 27, 2017.[40]

*Medical Records*

Although Mr. Israelson's medical records date back to 2008, the Court focuses on the medical records after the alleged onset date of December 5, 2012.   However, the Court notes the following relevant records from before December 2012:

On September 19, 2008, Mr. Israelson had an MRI of the lumbar spine.   He reported low back and left leg pain from a work injury that occurred in May 2008.   The MRI showed disc changes, "most notably L5-S1 without significant foraminal narrowing. The specific source for leg pain is not noted."[41]

On January 6, 2011, Mr. Israelson saw John Bursell, M.D., at Juneau Bone & Joint Center.   He reported injuring his back at work on December 6, 2010 while "pulling a load of paper on a pallet jack."   He also reported increased numbness in his left heel and lateral foot.   Mr. Israelson indicated that he had a history of "intermittent left heel numbness since 2008 from a prior back injury."   On physical examination, Dr. Bursell observed a normal gait; appropriate affect and demeanor; no gross edema or evidence of acute injury of the

---

[39] A.R. 1–5.

[40] Docket 1.  The delays in this appeal were the result of filing challenges.  Mr. Israelson's case was dismissed without prejudice on March 1, 2018 for failure to make service on the Commissioner.  Docket 6.  On March 12, 2018, the Court reopened the case.  Docket 7.  Mr. Israelson's case was dismissed without prejudice again on June 7, 2018 for failure to make service on the Commissioner.  Docket 9.  On June 21, 2018, the Court granted Mr. Israelson's motion to reopen the case in the interest of justice.  Docket 11.  On February 27, 2019, the Court granted Plaintiff's Motion to Accept Late filing.  Docket 22.

[41] A.R. 388.

back; 5/5 muscle strength in the lower extremities; and a positive left straight leg raise. Dr. Bursell assessed Mr. Israelson with low back pain and sciatica.[42]  On the same date, Mr. Israelson was released for light work.[43]

On January 7, 2011, Mr. Israelson had an MRI of his lumbar spine.  The MRI showed a "[s]mall right posterolateral herniation at the L5-L1 level with an underlying high intensity zone"; "[c]ompression of the origin of the right S1 nerve root"; and "[d]egeneration of the L4-L5 disc with a small central disc protrusion."[44]

On December 31, 2011, Mr. Israelson followed up with Dr. Bursell for low back pain.  Mr. Israelson reported that he had "some discomfort from time to time," but was ready to return to work.[45]

On March 23, 2012, Mr. Israelson presented to the emergency department at Bartlett Regional Hospital.  He reported injuring his back earlier that day at work which "pushing against [a] door with [his] left shoulder and pushing with [his] legs to close [the] door."  On physical examination, Mr. Israelson was ambulatory, alert and oriented, and his range of motion in his lower extremities was within normal limits.[46] On the same date,

---

[42] A.R. 360–61.

[43] A.R. 364.

[44] A.R. 363.

[45] A.R. 350.

[46] A.R. 405.

Mr. Israelson had an x-ray of the lumbar spine. The x-ray showed "[n]o acute process of the lumbar spine."[47]

On April 13, 2012, Mr. Israelson followed up with Dr. Bursell. He reported that he "was only able to tolerate three days of the Medrol dosepack due to becoming emotional/depressed from the steroids."[48]

On April 19, 2012, Mr. Israelson had an MRI of the lumbar spine. The MRI showed L4-5 and L5-S1 disc degeneration with left paracentral disc protrusion at L4-5 and right paracentral disc protrusion at L5-S1.[49]

On April 27, 2012, Mr. Israelson received an L4-5 interlaminar epidural steroid injection at the Juneau Pain Center.[50]

On May 1, 2012, Mr. Israelson followed up with Dr. Bursell. He reported no leg pain, but continuing lower extremity tingling. He also reported anxiety after the steroid injection and appeared anxious at the appointment.[51]

On May 4, 2012, Mr. Israelson followed up with Dr. Bursell for low back pain. He reported that his anxiety had "pretty much resolved" and had "less low back pain, and no lower extremity pain." Mr. Israelson reported that he was ready to return to work.[52]

---

[47] A.R. 408.

[48] A.R. 348.

[49] A.R. 386–87.

[50] A.R. 817.

[51] A.R. 346.

[52] A.R. 345.

On May 21, 2012, a workers' compensation claim representative wrote a letter to Dr. Bursell asking Dr. Bursell if he had a treatment plan to stabilize Mr. Israelson's lower back. The representative indicated that the workers' compensation claim date of injury was December 6, 2010.[53]

On October 13, 2012, Mr. Israelson saw Douglas Bald, M.D., for an independent medical evaluation for a work injury to Mr. Israelson's low back, reported December 6, 2010. Mr. Israelson reported first injuring his back in 1997, but "he did not seek any medical treatment for his injury and it ultimately resolved." He reported that he injured his back at work on May 14, 2008 and again at work on December 6, 2010. Dr. Bald observed a normal gait, pain at the extremes of motion in the lumbar spine in all directions; "considerable pain in the lower back when arising from the fully flexed position"; 5/5 muscle strength in the lower extremities; and restricted straight leg raise tests. He diagnosed Mr. Israelson with lumbar degenerative disc disease at L4-5 and L5-S1 with secondary central disc protrusion at L4-5 and right paracentral disc protrusion at L5-S1; lumbar strain with symptomatic aggravation of preexisting degenerative disc disease; and moderately severe discogenic lower back pain with intermittent right and left lower extremity radiculitis. Dr. Bald opined that Mr. Israelson was "not yet medically stable and stationary and I would definitely recommend a continuing program of treatment." He opined that Mr. Israelson was "physically capable of continuing in his current job as a shuttle driver for Alaska Marine Trucking, but he certainly does have restrictions, at least

---

[53] A.R. 384.

on a temporary basis, related to repetitive and heavy bending and lifting." Dr. Bald recommended a new MRI scan, referral to a physical therapist, and a prescription-strength anti-inflammatory agent on a daily basis.[54]

On October 30, 2012, Mr. Israelson had an MRI of the lumber spine. He reported having "low back pain for several years." The MRI showed "[d]egeneration of the L4-L5 disc with a small central disc protrusion unchanged" and "[d]egeneration of the L5-S1 disc with a small right paracentral disc protrusion and an underlying high intensity zone unchanged."[55]

On November 16, 2012, Mr. Israelson saw Scott Grosse, M.D., at Juneau Bone & Joint Center. He reported low back tenderness, but that he was "doing better." He also reported he would "continue with physical therapy until they deem him worthy for independent program"; and that he was "no longer taking the Vicodin." On physical examination, Dr. Grosse noted "positive dural tension signs on the left, but none on the right leg." He observed a normal gait and station; and that Mr. Israelson was "in good spirits."[56]

On December 4, 2012, Mr. Israelson visited Dr. Bursell. He reported increased back pain and that he was unable to lift 50 pounds "without causing a significant increase in his low back pain symptoms." On physical examination, Dr. Bursell observed a slowed

---

[54] A.R. 326–36.

[55] A.R. 385.

[56] A.R. 344.

gait. He noted that Mr. Israelson appeared to be in "moderate pain." Dr. Bursell recommended that Mr. Israelson "be taken off work for the next 2 weeks" and should "initiate physical therapy." He also recommended that Mr. Israelson "look into retraining as he may not be able to return to full-duty work as a Tractor Driver with the physical requirements described in his job description."[57]

The following are the relevant medical records after the alleged onset date of December 5, 2012:

On December 17, 2012, Mr. Israelson attended physical therapy at Juneau Physical Therapy with Patrick Ripp, PT, OCS, CMPT.[58]

On December 18, 2012, Mr. Israelson followed-up with Dr. Bursell. He reported that his low back pain fluctuated and the pain radiated down his left leg to his ankle. On physical examination, Dr. Bursell observed a normal gait; normal mental status; and appropriate affect and demeanor. He also observed that Mr. Israelson was "in no apparent distress." Dr. Bursell recommended that Mr. Israelson continue with physical therapy and opined he was "not yet ready to return to work." He opined that Mr. Israelson would be able to perform temporary transitional work after two weeks.[59]

On December 23, 2012, Mr. Israelson went to the emergency department at Barlett Regional Hospital in Juneau, Alaska. He reported acute chronic lower back pain "for

---

[57] A.R. 339–40.

[58] A.R. 421.

[59] A.R. 371, 808.

several days since slipping on ice and twisting but not actually falling down." On physical examination, the attending doctor observed "[m]ild vertebral point tenderness over the lower lumbar spine" and limited range of motion in the back; normal range of motion in the lower extremities; and no motor or sensory deficit. Mr. Israelson was prescribed Vicodin 500mg and Ibuprofen 600mg. He reported a pain level of 6/10 upon departure from the emergency department.[60]

On December 26, 2012 and January 2, 2013, Mr. Israelson attended physical therapy at Juneau Physical Therapy. Therapist Justin Dom, PT, DPT, noted that Mr. Israelson's straight leg raise test was negative; his muscle strength was 5/5 in the lower extremities; and he denied "any numbness into his feet."[61]

Also on January 2, 2013, Mr. Israelson followed up with Dr. Bursell. He reported lower back pain that "will radiate down his legs to the knees, and occasionally the ankles." On physical examination, Dr. Bursell observed a slow gait; no apparent distress; a normal mental status; and appropriate affect and demeanor; normal speech pattern; and grossly normal memory. Dr. Bursell opined that Mr. Israelson was "not ready to return to even light duty work at this point, although return to work is certainly the goal."[62]

---

[60] A.R. 389–93.

[61] A.R. 411, 413, 425. The record shows Mr. Israelson also attended physical therapy sessions on October 25, November 1, 6, 21, 2012, December 13, 17, 28, 2012, and January 4, 7, 9, 2013. A.R. 412, 414–30. On April 4, 2013, Mr. Israelson was discharged from Juneau Physical Therapy. A.R. 418.

[62] A.R. 591, 807.

On January 16, 2013, Mr. Israelson followed up with Dr. Bursell. He reported that his back was "too unstable to make progress" in physical therapy and that the therapist recommended a spine consultation referral to consider lumbar fusion. On physical examination, Dr. Bursell observed a normal gait and normal mental status. Dr. Bursell provided a referral to see Dr. Bozarth for a surgical consultation.[63]

On January 24, 2013, Mr. Israelson went to the emergency department at Bartlett Regional Hospital. He reported moderate back pain in the area of the lower lumbar spine, left SI joint, with pain radiating to the left hip. He also reported slipping on the ice that evening. On physical examination, the attending physician observed a normal gait; muscle spasm of the back; a painless range of motion; vertebral point tenderness of the mid and lower lumbar spine; and soft tissue tenderness in the right mid and lower lumbar area. The attending doctor assessed Mr. Israelson's fall risk and identified no such risk. Mr. Israelson was prescribed Vicodin 500mg. He reported a pain level of 2/10 upon departure.[64]

On January 28, 2013, Mr. Israelson saw Gordon Bozarth, M.D., at Juneau Bone & Joint Center for a surgical consultation. He reported "significant low back pain with left greater than right lower extremity dysesthesias." On physical examination, Dr. Bozarth observed a normal gait and posture; normal heel and toe walking; tenderness to palpation on the "paravertebral musculature extending from the T12-S1 level on the left greater

---

[63] A.R. 806.

[64] A.R. 473–77.

than right"; a full active range of motion; diminished sensation "over the plantar surface of the left foot per the patient"; and normal 5/5 motor strength in the bilateral lower extremities. Dr. Bozarth reviewed x-rays taken at the visit and noted "a very mild loss of disc height at the L5-S1 level"; mild facet arthropathy at the L4-L5 and L5-S1 level; and "no instability on flexion, extension views." Dr. Bozarth also noted the MRI from October 30, 2012 showed "[m]ild L4-L5 and L5-S1 degenerative disc disease"; "L4-L5 and L5-S1 small central protrusions"; and "[p]robable left lower extremity pseudoradiculopathy." Dr. Bozarth noted, "I do not believe he is a good surgical candidate. There is no instability at the L4-L5 and L5-S1 levels and he does not appear to have significant evidence of neurologic compression."[65] Dr. Bozarth opined that Mr. Israelson "should not return to work at this time" and was scheduled to follow up with Dr. Bursell.[66]

On February 8, 2013, Mr. Israelson followed up with Dr. Bursell. He reported a slip and fall the day prior and that his low back pain had increased with "a tingling sensation in both lower extremities." He reported that using a TENS unit with localized heat helped "with pain control." On physical examination, Mr. Israelson had a normal gait; was alert and oriented x3; had lumbar L4-L5 and L5-S1 spinous interspace tenderness; and 5/5 muscle strength in the lower extremities. Dr. Bursell gave Mr. Israelson "an exercise program to work on every day to include hip stretching and spinal stabilization exercises";

---

[65] A.R. 610–11.

[66] A.R. 586.

he also prescribed walking 30 minutes per day.[67]  Dr. Bursell opined that Mr. Israelson could return to work with restrictions, including alternating between sitting, standing, and walking and no lifting, pushing, or pulling over 0-15 pounds.[68]

On March 22, 2013, Mr. Israelson followed up with Dr. Bursell.  He reported that his symptoms were "essentially unchanged" and he had been walking 30-60 minutes per day.  Dr. Bursell observed a normal gait and normal mental status upon physical examination.[69]  He indicated no climbing, bending, and stooping and no lifting, pushing or pulling over 25 pounds.[70]

On April 22, 2013, Mr. Israelson presented at the emergency department at Bartlett Regional Hospital.  He reported cleaning his truck three days earlier and experiencing low back pain with radiation of pain down his left leg to his heel and right leg to his right lateral thigh.  On physical examination, the attending doctor observed moderate distress; vertebral point tenderness in the L5-S1 and over bilateral sacroiliac joint; mild soft tissue tenderness in the right lower, left lower, and lower central lumbar area; moderately limited range of motion in the back (secondary to pain); and negative straight leg raise tests bilaterally.  He was prescribed Norco.[71]

---

[67] A.R. 609.

[68] A.R. 585.

[69] A.R. 607.

[70] A.R. 590.

[71] A.R. 478–82.

On May 6, 2013, Mr. Israelson had an MRI of the lumbar spine. The MRI showed a small central disc protrusion at L4-L5 with "mild thecal sac effacement and minimal impingement upon the origin of the left L5 nerve root unchanged" and at L5-S1, a "small central disc protrusion with an underlying high intensity zone unchanged."[72]

On May 20, 2013, Mr. Israelson followed up with Dr. Bursell. He reported that his symptoms were unchanged. On physical examination, Dr. Bursell observed a normal gait; lumbar L4-L5 and L5-S1 spinous interspace tenderness; a normal sensory exam; 5/5 muscle strength; and a positive left straight leg raise test. Dr. Bursell referred Mr. Israelson to Marco Wen, M.D., for a lumbar discogram in consideration for a lumbar IDET procedure.[73]

On June 17, 2013, Mr. Israelson underwent a lumbar discogram with Dr. Wen. Dr. Wen recorded that at L4-5, "level 8 concordant pain was produced under moderate disc pressurization consistent with clinical discogenic pain and radiographic features of internal disc disruption and annular tears" and at L5-S1, "level 9 concordant pain was produced under low pressurization consistent with clinical discogenic pain and radiographic features of internal disc disruption and annular tears."[74]

On July 15, 2013, Mr. Israelson followed up with Dr. Wen. Dr. Wen noted that Mr. Israelson was "unresponsive to conservative treatment and ESI's" and had "poor sitting

---

[72] A.R. 612.

[73] A.R. 603.

[74] A.R. 462–63.

tolerance and clinical symptoms suggest[ing] discogenic pain." Dr. Wen also noted that Mr. Israelson had an "MRI showing [degenerative disc disease] most pronounced at L4-5 and L5-S1 with annular protrusion."[75] On the same date, Mr. Israelson underwent a L4-5 and L5-S1 percutaneous discectomy.[76]

On July 22, 2013, Mr. Israelson followed up with Dr. Bursell. He reported "doing well" after the percutaneous discectomy procedure one week prior. On physical examination, he had a normal gait and was alert and oriented x3.[77]

On August 8, 2013, Mr. Israelson followed up with Dr. Bursell. He reported "significant pain relief with regards to his leg pain" after the discectomy. He also reported that his low back pain increased with prolonged sitting and he was unable to "lift anything" without hurting his lower back. On physical examination, Dr. Bursell observed a normal gait; normal sensory exam; 5/5 muscle strength; and a negative bilateral straight leg raise. Dr. Bursell opined that Mr. Israelson had a permanent partial impairment rating of 8% of the whole person.[78]

On September 3, 2013, Mr. Israelson presented at the emergency department at Bartlett Regional Hospital. He reported back pain in lower thoracic and upper and lower lumbar spine, radiating to both sides. He also reported moving boxes four days prior "when [the] pain started." On physical examination, the attending doctor observed that

---

[75] A.R. 437.

[76] A.R. 730–31.

[77] A.R. 601.

[78] A.R. 600.

Mr. Israelson was in "moderate distress"; had normal range of motion in the lower extremities; a normal mood and affect; and a positive straight leg raise test on the left at 45 degrees. Mr. Israelson was prescribed Diazepam 10 mg for muscle spasm and Oxycodone 10mg for pain.[79]

On September 9, 2013, Mr. Israelson went to the emergency department at Bartlett Regional Hospital. He reported moderate, chronic back pain and one incident of urinary incontinence. On physical examination, the attending physician observed moderate soft tissue tenderness in the right, left, and central lumbar area; slightly decreased rectal tone; normal range of motion in the lower extremities; and normal mood and affect.[80] On the same day, Mr. Israelson had an MRI of his lumbar spine. The MRI showed "[r]ight paracentral disc protrusion at L5-S1 with small annular tear. The proximal S1 nerves may be abutted. No discrete findings to indicate recent surgical intervention." The MRI also showed a "[b]road concentric disc bulge/protrusion at L4-5. This has a similar appearance compared to previous exam."[81]

On September 10, 2013, Mr. Israelson followed up with Dr. Bursell. He reported that "[o]ver the past two weeks his low back pain symptoms [had] increased" and he "experienced loss of bladder control" the day before. On physical examination, Dr. Bursell observed that Mr. Israelson seemed "to be in moderate pain." Dr. Bursell also noted, "Mr.

---

[79] A.R. 484–88.

[80] A.R. 489–93.

[81] A.R. 502–03.

Israelson's lumbar spine MRI scan is not significantly changed from his prior studies. No acute surgical abnormalities are present on [the] MRI scan. At this point will monitor his symptoms, and refill the Vicodin for [pro re nata] pain control."[82]

On September 25, 2013, Mr. Israelson underwent a whole-body bone scan for low back pain. The bone scan showed "[m]ild nonspecific uptake, likely inflammatory or degenerative" and "[n]o significant spinal abnormality identified."[83]

On October 9, 2013, Mr. Israelson followed up with Dr. Wen. He reported that his "radicular symptoms improved following the procedure, however he ha[d] on-going right sided axial low back pain." He also reported that the pain was worse with sitting. Dr. Wen assessed Mr. Israelson with chronic axial low back pain. He noted that "[a]t this time, in light of the negative bone scan, I have assured [Mr. Israelson] results of the test rule out some of the more ominous concerns such as fracture or mass." Dr. Wen also noted that he didn't have "any procedures or interventional recommendations at this time."[84]

On October 11, 2013, Mr. Israelson went to the emergency department at Bartlett Regional Hospital. He reported severe back pain on the left and right sides of the lower lumbar spine with radiating pain in the left knee after changing his child's diaper, but he reported no bladder dysfunction, sensory loss, or motor loss. On physical examination, the attending physician observed moderate soft tissue tenderness in the lumbar back with

---

[82] A.R. 599.

[83] A.R. 504.

[84] A.R. 596.

limited range of motion and muscle spasm. Mr. Israelson presented with a normal mood and affect. The attending physician prescribed Percocet 5mg/325mg and Parafon Forte DSC 500mg.[85]

On November 11, 2013, Mr. Israelson followed up with Dr. Bursell. He reported increased low back pain symptoms and numbness in his feet and buttocks. On physical examination, Dr. Bursell observed that Mr. Israelson appeared to be in moderate pain with a slow gait; demonstrated 5/5 muscle strength; had a positive right straight leg raise; and was alert and oriented. Dr. Bursell noted that there was "some subjective sensory loss on the soles of the feet, but the neurological examination was otherwise intact."[86]

On November 19, 2013, Mr. Israelson saw Dr. Bald for a second independent physical examination. Dr. Bald observed good posture, a straight spine, normal gait, 5/5 muscle strength in the lower extremities, the ability to tiptoe and heel-heel walk, and the ability to balance on one foot bilaterally. Mr. Israelson reported pain at the extremes of motion of the lumbar spine in all directions. His straight leg raise test was "restricted by complaints of increased lower back and hamstring tightness." Dr. Bald diagnosed Mr. Israelson with lower lumbar degenerative disc disease at L4-5 and L5-S1 "preexisting with secondary central disc protrusion at L4-5 and right paracentral disc protrusion at L5-S1 preexisting and confirmed on initial MRI scan from September 2008"; lumbar strain "with symptomatic aggravation of preexisting degenerative disc disease—medically

_____

[85] A.R. 494–501.

[86] A.R. 594.

stable and stationary"; and chronic discogenic lower back pain. Dr. Bald opined that Mr. Israelson, "at this point in time, is clearly medically stable and stationary and does not require further hands on medical treatment directed toward his lower back." He opined that Mr. Israelson was not a surgical candidate. Dr. Bald also opined that at the time, Mr. Israelson did "not have the physical capabilities of returning to his job . . . as a driver for Alaska Marine Trucking, and will certainly need to be employed in the future in a less physically demanding profession." He recommended that Mr. Israelson "continue his current regimen of walking and back specific exercises."[87]

On December 9, 2013, Mr. Israelson followed up with Dr. Bursell. He reported persisting low back pain and intermittent numbness affecting his buttocks bilaterally. On physical examination, Dr. Bursell observed that Mr. Israelson appeared to be in moderate pain; was alert and oriented x3; had a normal gait, 5/5 muscle strength, and a negative bilateral straight leg raise. X-rays taken at the appointment showed "mild disc space narrowing at L5-S1" with the "remainder of the lumbar disc heights well maintained" and "[n]o vertebral translation."[88]

On January 2, 2014, Mr. Israelson presented at the emergency department of Bartlett Regional Hospital. He reported chest pain and discomfort, "like someone standing on my chest." Mr. Israelson appeared "in pain and anxious." On physical

---

[87] A.R. 464–72.

[88] A.R. 593.

examination, the attending physician observed a normal heart rate, heart rhythm, and heart sounds and a normal EKG.[89]

On February 10, 2014, Mr. Israelson had an MRI of the lumbar spine. The MRI showed a minimal increase in size of a left paracentral disc protrusion at L4-L5, which caused mild effacement of the left thecal sac and the origin of the left L5 nerve root, and minimal central disc protrusion with an underlying high intensity zone at L5-S1. The MRI also showed no neural compression.[90]

On March 31, 2014, Mr. Israelson travelled to Spokane, Washington for an independent neurosurgical examination by Karl Goler, M.D. Dr. Goler noted that Mr. Israelson had a "careful, but normal stable gait" and was able to walk on heels and toes. He noted a negative straight leg raise test bilaterally and 5/5 muscle strength bilaterally in the lower extremities. Dr. Goler diagnosed Mr. Israelson with lumbar degenerative disk disease, predominately at L4-5 and L5-S1, and multiple episodes of back pain. He opined that Mr. Israelson's neurologic exam was "essentially normal"; his MRI scans consistently showed a lack of neural compression and were "essentially unchanged between this point in time and 2008." Dr. Goler opined that Mr. Israelson had not "benefitted from any treatment." Dr. Goler also opined that Mr. Israelson was "a poor candidate for any further surgery, as there is no objective finding of nerve root compression or radiculopathy either on his physical examination or in his radiographic findings." Dr. Goler noted that there

---

[89] A.R. 507–15.

[90] A.R. 619.

were "inconsistencies on a physical examination that [was] remarkable for a paucity of objective findings to support radiculopathy."[91]

On June 11, 2014, Mr. Israelson visited Dr. Bursell. He reported that beginning one month prior, he was no longer able to walk in an upright position. Dr. Bursell noted a stooped gait; appropriate affect and demeanor; a normal sensory exam; 5/5 muscle strength in the lower extremities; and a positive straight leg raise test. Dr. Bursell also noted Mr. Israelson had "left lower extremity radicular symptoms consistent with lumbar spinal stenosis."[92]

On August 18, 2014, Mr. Israelson followed up with Dr. Bursell. He reported persistent low back pain and cramping of his left foot. Dr. Bursell started Mr. Israelson on gabapentin for chronic neuropathic pain.[93]

On August 19, 2014, state agency medical consultant William Backlund, M.D., reviewed Mr. Israelson's records and opined that Mr. Israelson was capable of light work limited by standing and walking a total of 4 hours in an 8-hour workday; occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, and crawling; and frequent balancing.[94]

---

[91] A.R. 567–84.

[92] A.R. 614.

[93] A.R. 628. On September 2, 2014, Mr. Israelson reported a reduction in left hip pain with gabapentin. A.R. 627.

[94] A.R. 166–67.

On September 12, 2014, Mr. Israelson followed up with Dr. Bursell. He reported increased low back pain. Dr. Bursell observed a left leg limp and slowed gait; tenderness in the left lumbar paraspinal muscles; a normal sensory exam; 5/5 muscle strength; and a positive left straight leg raise. Dr. Bursell noted that Mr. Israelson had "increased low back and radicular left lower extremity pain without evidence of radiculopathy on physical examination."[95]

On November 17, 2014, Mr. Israelson followed up with Dr. Bursell. He reported right shoulder pain. On physical examination, Dr. Bursell observed a normal gait; normal sensory exam; appropriate affect and demeanor; 5/5 muscle strength in the upper extremities; and a negative drop arm test. The x-rays taken at the appointment showed "[n]o evidence of fracture or dislocation"; that the "[g]lenohumeral joint [was] normal in appearance"; and a mild narrowing of the inferior AC joint was present.[96]

On December 1, 2014, Mr. Israelson followed up with Dr. Bursell. He reported slipping on the snow the day before and "twisting his low back." He appeared to be in moderate pain. His gait was slowed and affected by a limp. On examination, he had 5/5 muscle strength in the lower extremities and a positive left straight leg raise. Dr. Bursell noted that there was no evidence of lumbar radiculopathy found on physical examination, but Mr. Israelson had positive dural tension signs.[97]

---

[95] A.R. 626.

[96] A.R. 623.

[97] A.R. 622.

On December 10, 2014, Mr. Israelson followed up with Dr. Bursell.  He reported that he had been "slipping on the ice on his driveway and walkway" and his low back pain symptoms had increased.  He also reported that the Toradol injection helped with his shoulder pain, but not with his lower back or left leg pain.  Mr. Israelson appeared to be in moderate pain and was affected by a slow gait and left leg limp.  Dr. Bursell recommended Relafen and Gabapentin for pain control.[98]

On December 15, 2014, Mr. Israelson went to the emergency department at Bartlett Regional Hospital.  He reported lifting his one-year old child and feeling pain over his left lower back.  He reported running out of pain medication.  He walked with a cane.  He was given Norco 5mg/325mg for pain.[99]

On December 17, 2014, Mr. Israelson saw Bruce McCormack, M.D., for a second independent medical evaluation.  He reported sleep problems; a poor memory, focus, and concentration; and depression due to pain and insomnia.  On physical examination, Dr. McCormack observed significant shoulder mobility; a positive straight leg raise test on the left; "subjective numbness in the bottom of the foot"; and a depressed demeanor.  Dr. McCormack diagnosed Mr. Israelson with symptomatic lumbar disc disease with axial low back pain and unverified left leg radicular symptoms.  He opined that Mr. Israelson had a total whole person impairment rating of 8%.  He did not believe Mr. Israelson was a surgical candidate and opined that "[s]urgery with prosthetic disc or fusion would be a bad

---

[98] A.R. 621.

[99] A.R. 633–36.

result."  He opined that Mr. Israelson should "quit smoking, lose weight and do daily stretching and core strengthening."[100]

On January 8, 2015, Mr. Israelson saw Dr. Bursell.  He reported low back pain, left lumbosacral radiculitis, and right shoulder pain.  He reported no shoulder weakness and "a little" improvement in his right shoulder with physical therapy.  On physical examination, Mr. Israelson had a slow gait affected by a limp and good rotator cuff strength, but significant decreased motion in the right shoulder.  Dr. Bursell recommended physical therapy for the right shoulder and hydrocodone "to use at night so he [could] get some sleep."[101]

On January 21, 2015, Mr. Israelson followed up with Dr. Bursell.  He reported his sleep was interrupted due to right shoulder pain and reported chronic low back pain.  He walked with a left leg limp.[102]

On January 26, 2015, Mr. Israelson had an MRI of the right shoulder.  The MRI showed mild biceps tendinosis and moderate rotator cuff tendinosis; a superior labral tear; moderate capsular thickening and an increased signal suggesting adhesive capsulitis; and arthrosis of the acromioclavicular joint with advanced cartilage loss and minimal spurring.[103]

---

[100] A.R. 753–774.

[101] A.R. 675.

[102] A.R. 674.

[103] A.R. 676, 775.

On January 27, 2015, Mr. Israelson saw Dr. Bursell. Dr. Bursell reviewed the MRI results and opined that "[t]he labral tear may warrant surgery at some point in time, but I would wait until the adhesive capsulitis calms down prior to considering that intervention." He recommended continuing with physical therapy.[104]   On the same date, Dr. Bursell completed a physical capacities evaluation. He opined that Mr. Israelson could sit for two hours in an eight-hour work day and stand/walk for one hour in an eight-hour work day with a sit/stand option. He also opined that Mr. Israelson could lift or carry up to 20 pounds occasionally; occasionally balance, kneel, and crouch; never climb, stoop, or crawl; and never reach above shoulder level on the right. Dr. Bursell opined that Mr. Israelson's fatigue and pain were disabling to the extent that he would be prevented from working full time at even a sedentary position and that the pain and/or medication side effects moderately affected Mr. Israelson's attention and concentration.[105]

On February 5, 2015, Mr. Israelson followed up with Dr. Bursell. He reported an increase in low back pain with radiation down his right and left legs. He also reported that his pain was managed with hydrocodone 5mg. Dr. Bursell observed a slow gait affected by a limp. He was alert and oriented with an appropriate affect and demeanor.[106]

On February 26, 2015, Mr. Israelson followed up with Dr. Bursell for right shoulder pain. Dr. Bursell performed a trigger point injection.[107]

---

[104] A.R. 673.

[105] A.R. 637–41.

[106] A.R. 672.

[107] A.R. 671. He also received a trigger point injection on March 19, 2015. A.R. 669. He reported

On May 5, 2015, Mr. Israelson saw Charles Morgan, Ph.D., for a psychological assessment. Based on testing, Dr. Morgan diagnosed Mr. Israelson with a reading disorder and disorder of written expression. He also diagnosed Mr. Israelson with chronic adjustment disorder with depressed mood. He assigned a GAF score of 55. Dr. Morgan recommended accommodations for the reading and written language disorder with extra time on tests, providing reader or text in audible form, providing books on audio devices, computer assisted devices for dictation, and a spell checker. He also recommended mental health interventions.[108]

On May 22, 2015, Mr. Israelson saw Joesph Roth, M.D., at Laser Precision Spine Surgery, for an evaluation of lower back and left leg pain. He reported a history of GERD, arthritis, and depression. Dr. Roth recommended a lumbar myelogram/CT scan to "see if we can better document nerve root impingement."[109]

On June 4, 2015, Mr. Israelson underwent left L4-L5 lumbar laminectomy/decompression surgery. He was discharged on June 6, 2015.[110]

On July 3, 2015, Mr. Israelson went to the emergency department at Bartlett Regional Hospital. He reported slipping and falling in the bathroom after bathing, resulting

---

the injections helped with muscle pain at a follow up appointment on April 8, 2015. A.R. 667.

[108] A.R. 828–32.

[109] A.R. 825–27.

[110] A.R. 642–52.

in severe pain in the mid and lower lumbar spine. He left the emergency department in a wheelchair.[111]

On August 13, 2015, Mr. Israelson followed up with Dr. Bursell. He reported feeling more flexible and that he had been able to walk more since last seen. He reported that he had "not been requiring any pain medication, and only rarely require[d] diazepam to treat muscle spasms." On physical examination, Dr. Bursell noted that Mr. Israelson's gait was affected by a limp; he was alert and oriented; and had an appropriate affect and demeanor.[112]

On September 4, 2015, Dr. Bursell completed a questionnaire. He opined that Mr. Israelson did not have the capacity to perform substantial gainful activity on a sustained basis at any exertional level for 8 hours per day, 40 hours per week for 50 weeks per year. He did not provide a rationale for the opinion on the questionnaire.[113] On September 15, 2015, Joseph Roth, M.D., completed the same questionnaire and answered "unknown" whether Mr. Israelson was capable of substantial gainful activity on a sustained basis at any exertional level for 8 hours per day, 40 hours per week for 50 weeks per year. He noted that Mr. Israelson had used an aid to assist with ambulation during the 2-3 years he had known Mr. Israelson.[114]

---

[111] A.R. 679–83.

[112] A.R. 659.

[113] A.R. 653.

[114] A.R. 704.

The following records were submitted to the Appeals Council after the ALJ's decision of May 10, 2016[115]:

From approximately October 5, 2015 through August 23, 2016, Mr. Israelson was diagnosed with and treated for severe major depressive disorder. He attended counseling sessions with Keith Merrifield, LCSW, at Ethel Lund Medical Center.[116]

On November 23, 2015, Mr. Israelson completed a mental health questionnaire for South East Alaska Regional Health Consortium. The results of his PHQ-9 patient health questionnaire indicated severe depression. Mr. Israelson reported that he needed "to get past this anger issue and past this depression." He reported "experiencing irritability and angry outbursts on a daily basis" and feelings of worthlessness. In January 2016, Mr. Israelson reported significant anxiety with panic attacks daily. At that time, his GAF score was 52 and his prognosis was "guarded."[117]

On February 11, 2016, Mr. Israelson saw LCSW Merrifield. Panic disorder was added to his diagnoses for treatment.[118]

---

[115] Although the ALJ agreed to leave the record open after the February 2016 hearing to update the medical record with a neurological visit and psychological counseling records, there is no discussion of those records in ALJ LaCara's May 2016 decision. She cites only to Dr. Morgan's May 2015 evaluation. A.R. 103–04, 158.

[116] Mr. Israelson participated in counseling sessions on October 5, 28, 2015; November 23, 2015; and December 3, 10, 17, 2015. He attended counseling on January 14, 21, 28, 2016; February 11, 18, 25, 2016; March 3, 11, 28, 2016; April 4, 18, 25, 27, 2016; May 9, 23, 2016; June 1, 3, 6, 13, 2016; and August 23, 2016. A.R. 18–97.

[117] A.R. 21–27.

[118] A.R. 52.

On March 3, 2016, Mr. Israelson followed up with LCSW Merrifield. He was prescribed venlafaxine and trazodone.[119]

On April 4, 2016, Mr. Israelson saw LCSW Merrifield for counseling. He reported that "the prescribed medications for depression and sleep appear to have reduced his irritability."[120]

*Hearing Testimony on February 8, 2016*

Mr. Israelson attended and testified at a hearing before ALJ LaCara on February 8, 2016 with an attorney.[121] He testified that in the past he worked as a truck driver, in a cannery, in a warehouse, and as a commercial fisherman. He indicated that he had been working with vocational training and during testing, it was confirmed he had dyslexia. Mr. Israelson stated he had a driver's license, a valid commercial driver's license, and drove to the store or to doctor's appointments "once or twice a week." Mr. Israelson indicated that he stopped working in 2012 due to back problems, sleeping problems, and "[o]pening and closing containers at the yard was starting to take a toll on me.". He indicated he had back pain, leg pain, and shoulder pain. Mr. Israelson reported he could stand for an hour, walk for 30 minutes with a cane for balance, sit for 30 minutes, and lift up to 20 pounds. He testified that he could wash dishes and helped his wife by "following the little kids, keeping them out of trouble," but spent 70 percent of his time in a reclined position. He

---

[119] A.R. 86–89.

[120] A.R. 62.

[121] A.R. 132–54.

testified that he had two back surgeries in the past and that pain medications worked only temporarily. He testified he had attended physical therapy, spent 15 to 20 minutes each day doing physical therapy exercise, and could take care of his personal care with some helping putting his socks on. He indicated he wanted to go back to work, but he felt he would "have to call in sick a lot because of [his] back."[122]

Mr. Israelson also testified that he had "a lot of anger right now that I'm working through" and that he had been seeing a psychiatrist since November 2015 for "anxiety and anger management problems." He testified that he had gone to the hospital twice for anxiety attacks.[123]

Dr. Barnes testified as the medical expert. Based on his review of the record, Dr. Barnes opined that Mr. Israelson had lumbar disc disease, particularly at L4-5 and L5-S1, with some stenosis at L5 on the left and tendinosis of the right shoulder. He opined that Mr. Israelson did not meet or equal a listing. Dr. Barnes opined that Mr. Israelson's

---

[122] A.R. 132–54.

[123] At that point in the hearing, the ALJ asked, "Do you believe these conditions prevent you from working, Mr. Israelson?"

> Mr. Israelson answered, "I think they cause me not being able to work."
>
> The ALJ then stated, "I just asked you whether or not you believe your psychological conditions are severe enough to be considered impairments under the Social Security Act such that those impairments will prevent you from working. If that's the case, then we need to stop this hearing so that we can do another evaluation . . . So, I have no information about your psychological conditions."
>
> Mr. Israelson answered, "Okay, I talked to Keith [Merrifield] and he said he turned that stuff in. I think I have a problem with anger, working with other people right now." A.R. 148–49.

functional capacity would be at a light level, but he would be limited to lifting 20 pounds occasionally, ten pounds frequently; sitting for six hours a day at an hour a time; bending, stooping, kneeling, or crawling occasionally; using his right side occasionally; using foot controls frequently; climbing stairs or ramps occasionally; never climbing ropes or ladders; and having a sit/stand option at hourly intervals. He disagreed with Dr. Bursell's opinion that Mr. Israelson could only work three hours a day.[124]

Lane Wise testified as the vocational expert. Based on the ALJ's hypothetical, he opined that there were jobs that existed in the national or regional economy that Mr. Israelson could perform, including bench assembler, dispatcher, and gasket filler.[125]

At the February 2016 hearing, the ALJ notified Mr. Israelson that she would keep the record open for two weeks to give Mr. Israelson the opportunity to update his record with a neurology visit and treatment records documenting psychological counseling.[126]

---

[124] A.R. 125–31.

[125] A.R. 157. The ALJ's hypothetical was as follows:

Let's assume we have an individual of the same age, education and work experience [as] that of the claimant and who is able to perform light work. This person is able to stand and walk for four hours out of an eight-hour workday and sit six hours in an eight-hour workday with normal breaks. This person is allowed the sit/stand option that allows this person to alternate between sitting and standing positions at every hour for about five minutes at a time. This person does not leave the workstation. This person is limited to frequent bilateral foot control operation. This person is limited to do occasional climbing of ramps or stairs and no climbing of ladders, ropes or scaffolds. Frequent balancing with an assistive device. This person is also limited to the occasional stooping, kneeling, crouching and crawling. This person is limited to the occasional overhead reaching. So, no work past the shoulder level on the right side. Reaching in all the other directions is limited to frequent. This person is to avoid moderate exposure to extreme cold, excessive vibration and is to avoid all exposure to unprotected heights and is to avoid moderate exposure to hazardous machinery. A.R. 155–56.

[126] A.R. 158.

However, it appears from the Court's record that Mr. Israelson submitted mental health records from SEARHC and Ethel Lund Medical Center to the Appeals Council after the ALJ's written decision in May 2016.[127]

*Mr. Israelson's Function Report*

Mr. Israelson completed an undated function report. He reported that he tries to walk for 30 minutes. He reported his daily activities as doing dishes, helping with schoolwork, preparing food, and taking care of children. He reported he could lift grocery bags, small light boxes, and his baby, a couple times per day. He indicated that he could do household chores for 15 to 20 minutes before the "pain get[s] too great." He reported that at the end of the day he could "bar[e]ly move" and took pain medications. Mr. Israelson reported that he could drive a car for 30 minutes to one hour. He stated, "I [feel like] I am a [prisoner] in my own body."[128]

## IV. DISCUSSION

Mr. Israelson is self-represented in this appeal. Liberally construed, Mr. Israelson asserts in his opening brief that the ALJ failed to fully and fairly develop the record regarding his mental impairments and the Commissioner failed to consider additional evidence regarding his depression and anxiety.[129] The Commissioner disputes Mr. Israelson's assertions.[130] The Court addresses each of Mr. Israelson's assertions in turn:

---

[127] A.R. 18–97, 103–04, 158.

[128] A.R. 280–82.

[129] Docket 20 at 1.

[130] Docket 23 at 2–7.

A. Development of the Record

Mr. Israelson asserts that he has "other disabilities as well." He also alleges he had "documentation from Vocational Rehabilitation in Juneau, Alaska, saying that I could not receive retraining services due to me being unemployable, due to my [disabilities]."[131] The Commissioner maintains that the ALJ's non-disability determination was supported by substantial evidence.[132]

1. *Legal Standard*

The ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[133] An "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Additionally, the "ALJ must be especially diligent when the claimant is unrepresented or has only a lay representative."[134] If the evidence is insufficient to make a decision regarding disability or the ALJ cannot reach a conclusion based on the evidence she has before her, the ALJ may recontact a treating physician, psychologist, or other medical source, request additional existing records, or ask for more information from the claimant or others.[135]

---

[131] Docket 20 at 1.

[132] Docket 23 at 10.

[133] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

[134] *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011).

[135] *Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [a doctor's] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions

2. *Analysis*

In her decision, ALJ LaCara determined that Mr. Israelson's depression and anxiety were not medically determinable impairments and she did not include any mental limitations in Mr. Israelson's RFC.[136]  However, treatment records from as early as September 2012 show that Mr. Israelson experienced depression and anxiety symptoms.[137]  On May 5, 2015, Dr. Morgan diagnosed Mr. Israelson with chronic adjustment disorder with depressed mood.[138]  Further, despite stating that she would need to stop the hearing and do an evaluation if Mr. Israelson believed his anxiety and anger management problems prevented him from working, ALJ LaCara did not stop the hearing and Mr. Israelson was not evaluated.[139]

The ALJ was required to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."[140]  It was incumbent upon ALJ LaCara to evaluate Mr. Israelson's mental impairments based on a thorough review of the records.  Further, the ALJ acknowledged Mr. Israelson's adjustment disorder, reading disorder, and disorder

---

to them."); *see also* 20 C.F.R. §§ 404.1520b, 416.920b (effective until March 27, 2017).

[136] A.R. 106.

[137] Although the first record of counseling for depression is from October 5, 2015, Mr. Israelson displayed depression and anxiety symptoms periodically throughout the treatment records, beginning in September 2012.  A.R. 346, 507–15, 571, 738, 753–74.

[138] A.R. 828–32.

[139] A.R. 158.  *See supra* note 123.

[140] *Higbee v. Sullivan,* 975 F.2d 558, 561 (9th Cir. 1992) (per curiam) (quoting *Cox v. Califano,* 587 F.2d 988, 991 (9th Cir. 1978)).

of written expression were medically determinable impairments. Yet, mental limitations were not included in the RFC.[141] Without evaluating Mr. Israelson's mental limitations of depression and anxiety in combination with his physical impairments, the record was incomplete. ALJ LaCara should have developed the record regarding the combination of Mr. Israelson's mental impairments with his severe impairments of degenerative disk and facet disease of the lumbar spine and tendinosis of the right shoulder to determine if together these impairments could have been disabling.[142]

For the foregoing reasons, the ALJ did not develop the record adequately with respect to the status of Mr. Israelson's mental impairments.

B. Additional Evidence

Mr. Israelson asserts that his former attorney "did not provide all of my various disability documentation and information. They only provided the information concerning my back injury even though I provided them with all my other documentation."[143] The Court can consider additional evidence "rejected by the Appeals Council, to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error."[144] In its decision, the Appeals Council noted that

---

[141] A.R. 106. *See Orn v. Astrue,* 495 F.3d 625, 630; 42 U.S.C. § 423(d)(2)(B) (all medically determinable impairments must be considered in the remaining steps of the sequential analysis).

[142] *Carmickle v. Comm'r Soc. Sec. Admin.,* 533 F.3d 1155, 1164 (9th Cir. 2008); *see also* SSR 96-8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of of an individual's impairments, even those that are not 'severe.'").

[143] Docket 20 at 1.

[144] *Id.* at 1232.

the additional psychological records submitted by Mr. Israelson did "not show a reasonable probability that [they] would change the outcome of the decision."[145] However, certain psychological records from LCSW Merrifield and SEARHC were made a part of the Court's record.[146]

The Ninth Circuit has held that the Commissioner's decision was not supported by substantial evidence when new evidence directly undermined the basis of the ALJ's analysis.[147] Here, the additional evidence submitted to the Appeals Council supports Mr. Israelson's testimony that he had anxiety and anger management issues and directly undermines the basis of the ALJ's analysis.[148] Mr. Israelson submitted records to the Appeals Council documenting psychological counseling with Keith Merrifield, LCSW, from approximately November 23, 2015 through August 23, 2016 showing he received psychological help and was prescribed medications for depression and anxiety.[149] He testified that he had been seeing a psychiatrist since November 2015 and had been evaluated and treated for anxiety and anger management problems.[150]

---

[145] A.R. 2.

[146] A.R. 18–97.

[147] *Brewes,* 682 F.3d at 1163–64; *see also Decker v. Berryhill,* 856 F.3d 659, 665 (9th Cir. 2017) (Brewes's new evidence directly undermined the basis of the ALJ's analysis).

[148] *Decker,* 856 F.3d at 665.

[149] A.R. 18–97.

[150] A.R. 148–49.

As set forth above, the ALJ did not consider objective medical evidence of Mr. Israelson's depression and anxiety in her decision. She failed to stop the hearing to perform an evaluation, did not hold a new hearing to consider Mr. Israelson's psychological treatment records, and did not elicit testimony or interrogatories from a psychological expert.[151] The additional psychological records submitted after the ALJ decision support Mr. Israelson's testimony and treatment notes and directly contradict the ALJ's findings, undermining the basis for her decision.[152]

ALJ LaCara's decision regarding Mr. Israelson's mental impairments is directly undermined by the additional evidence such that it is not supported by substantial evidence. On remand, the ALJ should review Mr. Israelson's records regarding mental impairments and obtain a psychological expert to testify or answer interrogatories regarding Mr. Israelson's mental impairments.

C.    Scope of Remand

The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[153] Here, the Court has found that the ALJ did not fully and fairly develop the record regarding Mr. Israelson's mental limitations

---

[151] A.R. 104, 106, 148–49.

[152] *See Morgan v. Sullivan,* 945 F.2d 1079, 1081 (9th Cir. 1991) ("The significant date for disability compensation is the date of onset of the disability rather than the date of diagnosis.")

[153] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

and the psychological records submitted to the Appeals Council directly undermine the ALJ's decision.

Therefore, the case will be remanded for the Commissioner to review Mr. Israelson's additional records and hold hearings as necessary to develop the record regarding Mr. Israelson's mental impairments, adjust the RFC as warranted, and take additional evidence as warranted.

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error.   Accordingly, IT IS ORDERED that Mr. Israelson's request for relief at Docket 20 is GRANTED, the Commissioner's final decision is VACATED, and the case is REMANDED to the SSA for further proceedings consistent with this decision.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 1st day of August 2019 at Anchorage, Alaska.


*/s/ Sharon L. Gleason*_____
UNITED STATES DISTRICT JUDGE